### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PATRICIA KILBY-ROBB,** | |
| Plaintiff, | |
| v. | Case No. 1:12-cv-01718 (CRC) |
| **ARNE DUNCAN, Secretary, U.S. Department of Education,** | |
| Defendant. | |

### MEMORANDUM OPINION

Plaintiff Patricia Kilby-Robb, an African-American woman in her fifties, applied for a promotion to a vacant Management Analyst position at the United States Department of Education ("DOE"). After interviewing Kilby-Robb and Stacy Kreppel, another DOE employee, the Department selected Kreppel. Kilby-Robb has now brought suit, alleging that DOE discriminated against her on the basis of her age and race and retaliated against her for having filed a prior Equal Employment Opportunity Commission ("EEOC") claim. The Department moves for summary judgment, arguing that it hired Kreppel simply because she was the more qualified applicant. Because Kilby-Robb has not offered sufficient evidence to permit a reasonable juror to conclude that the Department selected Kreppel for a discriminatory reason, the Court will grant the Department's motion on her discrimination claim. But because Kilby-Robb has produced plausible evidence to support an inference that she was not selected because she had recently filed an EEOC complaint, the Court will deny summary judgment to the Department on her retaliation claim.

### I.    Background

Kilby-Robb began working at DOE in 2000 as a National Representative before transferring in 2002 to the Office of Innovation and Improvement ("OII"), which administers grant programs. Def. Statement of Material Facts ("DSOF") ¶ 1; Ex. 1(OII Homepage). In OII, Kilby-Robb was the

Team Leader for the Parent Information and Resource Centers, Def. Mot. for Summ. J. ("Def. Mot.") Ex. 7 (Kilby-Robb's Resume), which fosters parental involvement in education programs outside of ordinary public schools.  DSOF ¶ 4; Def. Mot. Ex. 2 (Summary of Offices of Parental Information and Resource Centers).  According to Kilby-Robb's resume, when she applied for the vacant position she had a master's degree in developmental psychology and education, was a PhD candidate in education and psycho-educational studies, and had completed a number of postgraduate programs.  Id. Ex. 7.  Before joining DOE, Kilby-Robb worked for over thirty years as a teacher, assistant principal, principal, and school reform consultant.  Id.

In November 2003, Kilby-Robb filed an EEOC complaint alleging that DOE discriminated against her based on race and sex after she received a low performance rating.  Kilby-Robb v. Spellings, 522 F. Supp. 2d 148, 153 (D.D.C. 2007), aff'd, 309 F. App'x 422 (D.C. Cir. 2009).  Just over a year later, in December 2004, Kilby-Robb met with three members of OII's senior management: Nina Rees, Assistant Deputy Secretary for OII; John Fiegel, Kilby-Robb's immediate supervisor; and Marcie Brown, Rees' Chief of Staff.  Pl. Opp'n Ex A at 1005.  According to Kilby-Robb, Rees and Fiegel severely criticized her for filing the complaint, calling her "an embarrassment" and asking whether she "wanted money [or] wanted to be happy."  Id. at 1005–06.  Kilby-Robb eventually brought suit in this Court based on the allegations in her EEOC complaint, which the district court dismissed on summary judgment.  Kilby-Robb, 522 F. Supp. 2d at 148, aff'd, 309 F. App'x 422.

Stacy Kreppel began working at DOE in 1999 after obtaining a bachelor's degree in political science and a master's degree in public policy.  Def. Mot. Ex. 9 (Kreppel's Resume).  She started as a Presidential Management Intern and was promoted to Management and Program Analyst in 2001.  Id.  In 2003, she moved to OII to help implement the public school choice and Supplemental Educational Services ("SES") provisions of the No Child Left Behind Act of 2001,

115 Stat. 1425 (2002).  Id.  The public school choice provisions of the Act allow families to move their children from public schools that are in need of improvement to other schools.  Id.  The SES provision provides tutoring and other academic enrichment activities outside of the regular school day to eligible public school children.  Id.  At OII, Kreppel reported to Thomas Corwin, Def. Mot. Ex. 4b at 38–39 (Anderson's Test. at EEOC Hr'g), the Associate Deputy Undersecretary of OII from 2003 to 2004, Def. Mot. Ex. 4f at 170 (Rees' Test. at EEOC Hr'g).  Corwin's duties included advising Rees on school choice and SES.  Id.

In 2004, Corwin left OII to return to the Department's budget office.  Def. Mot. Ex. 4f. (Rees Test. at EEOC Hr'g).  As a result, according to the Department, Rees needed a senior-level staff person to advise her on school choice and SES.  Id.  She and her deputy, Mike Petrilli, decided to promote Kreppel into this position.  Id.  An email from Petrilli explained that Kreppel had successfully assumed Corwin's policy responsibilities related to school choice and SES, stating that she had "more than demonstrated her capacity to work at high levels. . . . She's basically doing Tom's old job on the policy front, and doing it well."  Def. Mot. Ex. 10.  (Email from Petrilli to Margo Anderson, Executive Officer for OII, Nov. 16, 2004).  In February 2005, Rees and Margo Anderson completed the description of duties for this new position, which included briefing Rees on a regular basis, organizing and leading meetings, making presentations, and overseeing revisions to guidance with respect to public school choice and SES.  Def. Mot. Ex. 11 (Position Authorization and Description).  The position also required a solid understanding of other policy issues affecting OII, including charter schools, magnet schools, teacher quality, and parental information and outreach.  Id.  The two "selective factors" for the position, meaning the primary requirements, were experience applying the public school choice and the SES provisions of No Child Left Behind.  Id.; Def. Mot. Ex. 12 (Vacancy Announcement).

Kilby-Robb and Kreppel both applied for the position, and Vicki Cosey, the human resources employee who managed the recruitment process, found them to be the only qualified candidates. Pl. Opp'n Ex. B at 307–308 (Cosey's Test. at EEOC Hr'g). Rees invited Kilby-Robb to a meeting on August 2, 2005, and when Kilby-Robb inquired about an agenda for the meeting, Rees replied that it would be an interview for the position. Pl. Opp'n Ex. A at 1074 (Email exchange between Kilby-Robb and Rees about purpose of the meeting). Rees, with Anderson present, interviewed each candidate separately. Def. Mot. Ex. 4h at 199–207 (Rees Test. at EEOC Hr'g). Rees did not prepare standard interview questions or take notes during either of the interviews. Id. According to Kilby-Robb, the interview did not go well. She says Rees told her to sit at Rees' desk instead of the conference table, and that Rees asked questions rapidly, while interrupting and contradicting her responses. Pl. Opp'n Ex. A at 1002–03 (Kilby-Robb Interrog.). For her part, Rees recalled being surprised at certain entries on Kilby-Robb's application that appeared inaccurate, such as one claiming that she had drafted regulations. Def. Reply Ex. 2 at 213–14 (Rees Test. at EEOC Hr'g). Ultimately, Rees selected Kreppel for the position. Def. Mot. Ex. 17 at 2 (Rees' Interrog.).

After exhausting all necessary administrative proceedings, Kilby-Robb brought suit in this Court against DOE through its Secretary, Arne Duncan. She alleges that DOE discriminated against her on the basis of race and age and retaliated against her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–34, by awarding the position to Kreppel. DOE has moved for summary judgment as to all of Kilby-Robb's claims.

## II.     Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the burden to demonstrate the "absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To overcome a motion for summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." Id. at 324 (quotation omitted). A dispute is genuine only if a reasonable fact-finder could find for the non-moving party; a fact is only material if it is capable of affecting the outcome of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Laningham v. U.S. Dep't of the Navy, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." Scott v. Harris, 550 U.S. 372, 378 (2007) (quotation and brackets omitted).

### III.   Analysis

#### A.   Race and Age Discrimination Claim

Title VII prohibits, among other things, an adverse employment action on the basis of race. 42 U.S.C. § 2000e-2(a)(1). Similarly, the ADEA prohibits discriminating against individuals on the basis of age. 29 U.S.C. § 623. Courts analyze both statutes under the familiar McDonnell Douglas framework, which first requires the plaintiff to demonstrate a *prima facie* case of discrimination. Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998); Hall v. Giant Food, Inc., 175 F.3d 1074, 1077 (D.C. Cir. 1999). The burden then switches to the defendant to show that there was a lawful reason for the employment action. McDonnell Douglass Corp. v. Green, 411 U.S. 792, 802 (1973). If the defendant does so, then the question on summary judgment becomes whether, based on the totality of the parties' evidence, a reasonable jury could determine that the defendant's proffered explanation was pretext for discrimination. Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494–95 (D.C. Cir. 2008).

In a suit alleging discrimination in a hiring or promotion decision, a plaintiff ordinarily demonstrates that the employer's stated reasons were pretextual by proffering evidence that she was substantially better qualified than the applicant ultimately selected, thereby raising the inference that the employer's actual reason for its hiring decision was discriminatory. Hamilton v. Geithner, 666 F.3d 1344, 1351–52 (D.C. Cir. 2012). A plaintiff can also establish pretext by "expos[ing] other flaws" in the employer's explanation for its selection decision. Id. at 1355–56. DOE here argues that it selected Kreppel because she "was simply the most qualified for the position and demonstrated this with accurate and comprehensive answers to the questions that were asked during the interview and in her application." Def. Mem. at 6 (internal quotation omitted). Kilby-Robb responds with three broad arguments in an effort to show that the Department's stated reasons for hiring Kreppel were pretextual: first, that the Department improperly "preselected" Kreppel as part of a broader practice of favoring Caucasian job applicants; second, that she was substantially more qualified than Kreppel; and third, that the hiring process suffered from a variety of procedural flaws that suggest a discriminatory motive on the part of the decisionmakers. The Court addresses each argument below.

> i. Preselection

"Preselection" refers to the practice of soliciting a particular candidate to apply for a job vacancy. Preselecting a candidate for a position based upon his or her qualifications is not *per se* improper. Nyunt v. Tomlinson, 543 F. Supp. 2d 25, 39 (D.D.C. 2008). When an employer preselects a candidate based solely upon the candidate's qualifications, the employer does not violate federal discrimination law. Id. (citing Goostree v. Tennessee, 796 F.2d 854, 861 (6th Cir. 1986)). For preselection to raise an inference of discrimination, evidence must demonstrate that the employer preselected a candidate out of a discriminatory motive or that the employer broadly uses preselection as a method of disguising discrimination and did so in a particular case. See Glass v.

6

LaHood, 786 F. Supp. 2d 189, 224–25 (D.D.C. 2011); Talavera v. Fore, 648 F. Supp. 2d 118, 135–36 (D.D.C. 2009).

Applying these standards here, there is nothing facially discriminatory about the decision to preselect Kreppel.  Rees and Petrilli's contemporaneous emails demonstrate that Department officials sought to promote Kreppel because they believed she was already successfully performing the specific requirements of the new job in her existing role, Def. Mot. Ex. 10, which is a legitimate basis for preselecting a candidate.  See Nyunt, 543 F. Supp. 2d at 39 (preselection motivated by a desire to hire a "superbly qualified candidate" already working within the agency raises no inference of discrimination).  There is no evidence, nor has Kilby-Robb argued, that Rees or Petrelli expected Kilby-Robb or anyone else to apply for this position at the time they preselected Kreppel.  Thus the preselection could not have been designed to mask discrimination targeted at Kilby-Robb.  Cf. Calhoun v. Johnson, 632 F.3d 1259, 1261 (D.C. Cir. 2011) (indicating that an employer's preselection was a factor in discriminating against an employee because the employer knew that the employee was one of only two who qualified for the position and that the employee would likely apply for it).

Kilby-Robb asserts that preselecting Kreppel was discriminatory because it violated DOE's competitive selection procedures.  Def. Opp'n at 31–33.  She points to testimony by Vicki Cosey, the human resources manager, who stated that although preselection is a common method of promoting government employees, she personally believed the practice raises the appearance of partiality.  Id. Ex. B at 328–36.  The ethics of preselection in government hiring, however, is not at issue in this case.  The only relevant question is whether *this* instance of preselection violated DOE's ordinary or required practices so as to raise an inference that the actual reason for the preselection was Kilby-Robb's race.  Kilby-Robb puts forth no evidence that DOE violated any express or implied policy.  As a result, she fails to establish that preselection here was used as

pretext to discriminate against her.  See Talavera, 648 F. Supp. 2d at 135 (without indicia of discriminatory motive for preselection, there is no evidence of pretext).

Kilby-Robb alternatively argues that DOE used preselection in a discriminatory manner more generally, citing to statistics showing that only one of OII's eighteen new hires from 2002 through June 2005 was African-American.  Def. Opp'n Ex. C (Promotions and New Hires Composition Memo from Anderson to Rees, June 13, 2005).[1]  Independent evidence of discriminatory practices can demonstrate than an employer's nondiscriminatory explanation for its decision, such as the preselection here, was pretextual.  See Czekalski v. Peters, 475 F.3d 360, 368 (D.C. Cir. 2007).  While this statistic raises questions, it is not enough on its own to support an inference that Kreppel's preselection was discriminatory.  Over that same period, OII *promoted* ten individuals in the GS-13 to GS-15 bands, four of whom were African-American, four of whom were Caucasian, and two of whom were Hispanic.  Id.  It also promoted thirteen individuals below the GS-13 band, eight of whom were African-American, one of whom was Asian-American, and four of whom were Caucasian.  Id.  Given that Kilby-Robb seeks to demonstrate that the decision to promote Kreppel to a GS-14 position was fueled by discriminatory animus toward African-American applicants, the fact that OII actually promoted more non-white applicants during the relevant period instead undercuts her argument that OII's hiring statistics reveal discriminatory practices.  See Krodel v. Young, 748 F.2d 701, 710 (D.C. Cir. 1984) (relevance of statistical evidence dependent on similarity to plaintiff's circumstance); Warner v. Vance-Cooks, 956 F.

---

[1]  Kilby-Robb also points to testimony by Cosey that government agencies, in the early 2000s, were not using "outstanding scholar certificates" for their intended purpose of hiring non-white applicants.  Pl. Opp'n Ex. B at 340–41.  Cosey further explains, however, that the outstanding scholar certificate program was not administered by OII, that misuse of certificates was a government-wide problem, and that the problem was caused in part because the substantial majority of applicants for applicable, entry-level positions were Caucasian.  Id. at 341–42.  Taken as a whole, Cosey's testimony regarding this program does not suggest an intent by OII to discriminate against Kilby-Robb.

Supp. 2d 129, 159 (D.D.C. 2013) (statistics not directed towards specific position or equivalent

positions are of lesser evidentiary weight).  Furthermore, Kilby-Robb has put forth no evidence of

the overall racial composition of employees within OII, or the relevant applicant pool, to compare

to these promotion and hiring statistics.  Cf. Holcomb v. Powell, 433 F.3d 889, 899 (D.C. Cir.

2006) (evidence that agency "employs members of plaintiff's protected class at rates far below their

numbers in the applicant pool and the general population" permits an inference of discrimination)

(citing Aka, 156 F.3d at 1295 n.11).

### ii. Qualifications

Kilby-Robb also argues that Kreppel's hiring was discriminatory because she was more

qualified than Kreppel.  Employers have discretion to select among equally qualified candidates as

long as their decisions are based on lawful criteria.  Texas Dep't of Community Affairs v. Burdine,

450 U.S. 248, 259 (1981).  But a jury can infer discrimination if "a reasonable employer would

have found the plaintiff to be significantly better qualified for the job[.]"  Hamilton, 666 F.3d at

1352 (citing Aka, 156 F.3d at 1294).  If a reasonable jury would disagree with the employer's

decision but find the question a close call, then the jury could not infer discrimination solely on the

basis of qualifications.  Id.  "To justify an inference of discrimination," then, "the qualifications gap

must be great enough to by inherently indicative of discrimination."  Holcomb, 433 F.3d at 897

(citing Lathram v. Snow, 336 F.3d 1085, 1091 (D.C. Cir. 2003)); see also Fischbach v. D.C. Dep't

of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("Title VII liability cannot rest solely upon a judge's

determination that an employer misjudged the relative qualifications of admittedly qualified

candidates.").

The D.C. Circuit's prior cases on qualification gaps provide a useful framework for the

Court's analysis of this issue.  In Aka, the Circuit held that a reasonable jury could infer pretext

when the successful candidate for a pharmacy technician position had two months of directly

relevant prior experience and no college education, while the plaintiff had 19 years of experience as a hospital orderly and a master's degree in business and professional administration.  156 F.3d at 1296–97.  In Hamilton, the person selected had no college degree or formal training and had approximately eight years of relevant experience, little of which was from the decade immediately preceding the hiring decision.  666 F.3d at 1353.  The plaintiff, by contrast, had a master's degree in the field and 19 years of direct experience.  Id.  Even there, however, the court found that whether the plaintiff was "'significantly'" more qualified was a close question, requiring review of factors other than the qualification gap.  Id. at 1352 (quoting Holcomb, 433 F.3d at 897).

Here, OII listed several requirements for the Management Analyst position, but policy expertise in SES and school choice were paramount.  Def. Mot. Ex. 12 (Vacancy Announcement).  The department's vacancy announcement listed the major duties and requirements as: 1) advising OII management on the effectiveness of programs and operations; 2) possessing a deep understanding of SES, school choice, and teacher quality to provide policy advice; 3) conducting research, organizing and leading meetings, making presentations, and overseeing revisions to guidance, with respect to school choice and SES; and 4) advising on charter schools, magnet schools, teacher quality, and parental information and outreach.  Def. Mot. Ex. 12 (Vacancy Announcement).   The Department listed the two "selective factors," which are the primary criteria required for the position, as experience with the SES and school choice provisions of No Child Left Behind.  Def. Mot. Ex. 11 (Position Authorization and Description); Ex. 12 (Vacancy Announcement).  It stated that the applicant's "[w]ork in these areas must include extensive policy analysis, editing, writing, and speaking on these issues."  Id. Ex. 11.  These requirements make clear that the position requires experience researching and advising on public school choice and SES, as well as leading meetings and making presentations.

Kreppel's resume and application clearly demonstrate her expertise in the position's central tasks. She essentially performed the job during the prior two years, when she supported "the effective implementation of the public school choice and SES provisions of NCLB," Pl. Opp'n Ex. A at 1242 (Kreppel's Vacancy Application), advised Rees on policy issues, and drafted documents and performed research on public school choice and SES. Id.; Def. Reply Ex. 11 at 175 (Rees' Test.at EEOC Hr'g). Specifically, she had written numerous policy papers on SES and school choice, including "the 'Boehner-Gregg' report, which provided thorough and detailed information on six States' and six districts' implementation of school choice and SES." Pl. Opp'n Ex. A. at 1243. Indeed, Kilby-Robb's argument that the position was written with Kreppel in mind implicitly acknowledges that the requirements of the position were closely aligned with Kreppel's past work, which included performing the responsibilities of the job after Corwin left OII. Pl. Opp'n at 30; Def. Mot. Ex. 10. As explained previously, preselection is not itself evidence of discrimination, and in this case only reinforces how well-qualified Kreppel was for this position.

Kilby-Robb contends that Kreppel could not possibly have taken over policy research in SES and school choice because she had only a master's degree and four years of work experience at DOE by the time Corwin left. Pl. Opp'n at 36–37. Kilby-Robb does not explain, however, what further qualifications an individual might need in order to perform in-depth policy research. She merely posits that, as a matter of course, it would be "absurd" to believe a person could become an expert in a set of regulations over this period of time. Id. Kilby-Robb also claims that she personally knows that Kreppel is not a subject matter expert because, while Kreppel was an intern, Kilby-Robb saw her give a PowerPoint presentation that did not demonstrate in-depth expertise in SES and school choice. Pl. Opp'n Ex. E ¶ 22 (Kilby-Robb Decl.). But this is not inconsistent with Kreppel becoming a subject matter expert in the time since she worked as an intern. And simply because Kreppel had been given a low-level assignment while an intern does not mean she was

11

incapable of work requiring more expertise.  For example, Kreppel explained in her application

questionnaire that she leads a weekly school choice and SES Working Group by creating the agenda

and presenting to senior leadership.  Pl. Opp'n Ex. A at 1244.  She also states that she had

"presented SES and school choice data to public audiences at numerous conferences and

workshops" and regularly presents on SES and school choice to senior leadership within OII.  Id.

Aside from viewing certain presentations, Kilby-Robb acknowledged that she had no personal

knowledge of what Kreppel's actual job duties were.  Def. Reply Ex. 15 at 3 (Pl. Resp. to Def. First

Set of Req. for Admis.).

   Given that Kreppel was clearly qualified for the position, Kilby-Robb has a high bar to meet

in order to show that she was so much more qualified that a jury could reasonably conclude DOE

selected Kreppel for discriminatory reasons.  Kilby-Robb's qualifications, however, were less

closely aligned to the position's requirements than were Kreppel's.  While Kilby-Robb certainly has

significant work experience, education, and training within the education field more broadly, her

resume and questionnaire answers demonstrate minimal experience performing the key

responsibilities of the Management Analyst role:  She had never worked as a researcher or analyst,

did not draft policy memoranda or provide policy advice to senior members of OII, and had only

overseen contractors analyzing the SES or public school choice provisions of the No Child Left

Behind Act—along with many other provisions—but had not worked directly on that analysis.  See

Def. Mot. Ex. 7 (Kilby-Robb's Resume).  For instance, her response to the application question

about experience applying public school choice and SES fails to mention any work on those

provisions; instead she describes her work as the Parent Information and Resource Centers Team

Lead, a consultant to low performing schools, and a local educator and administrator, but never

mentions SES or public school choice.  Pl. Opp'n Ex. A at 1223–25 (Kilby-Robb's Vacancy

Application).  In her opposition to summary judgment, she provided a summary comparing her

qualifications to Kreppel's.  Pl. Opp'n Ex. A at 1022–37 (Kilby Robb's Interrog.).  But even here,

Kilby-Robb does not explain her direct experience with *researching or analyzing* the relevant

statutory provisions.  She states that she "monitor[ed] and support[ed] effective implementation of

[among other things, the] public school choice, and SES provisions."  Id. at 1022.  She also

indicates that she received and disseminated reports and "reviewed letters drafted by others to

provide technical assistance to States, Districts, and local educational agencies on state

accountability systems, SES, public school choice, Parental Information and Resource Centers."  Id.

at 1023.  But reviewing and disseminating reports is not the same as researching or drafting them.

Kreppel, by contrast, had significant experience with that precise work.

     Further, Kilby-Robb provides no evidence to support her claim that the Department ignored

or misstated her qualifications.  She simply asserts that the Department ignored her twenty-five

years as a local school educator and administrator where she administered "the policies in

question."  Pl. Opp'n at 38.  Public school choice and SES, as provisions of the No Child Left

Behind Act, only came into existence four years before the vacancy announcement, along with the

rest of that Act.  And while Kilby-Robb may have had relevant experience implementing other

programs that moved children out of faltering schools or provided tutoring, that experience is not

equivalent to providing research or drafting policy advice on specific regulations.  Without more,

no reasonable jury could conclude that this experience demonstrates a significant qualifications gap

in Kilby-Robb's favor.

     Kreppel's work at DOE demonstrated that she was qualified for the specific position OII

required.  Indeed, her specialization in school choice and SES policy work indicates she was as or

more qualified than Kilby-Robb.[2]  Accordingly, not only does the difference in qualifications

---

[2] In her opposition, Kilby-Robb attempts to rely on a personnel expert whom she did not designate
under FRCP 26(a)(2) during discovery.  FRCP 26(a)(2) requires  parties to disclose experts and

between the candidates fail to support an inference that the Department's stated reasons promoting Kreppel were pretextual, it bolsters the Defendant's proffered justification.

### iii. Procedural Irregularities

Along with disparate qualifications of the applicants, procedural irregularities in the selection process also may demonstrate that the employer's justification for a hiring or promotion decision was pretextual. Hamilton, 666 F.3d at 1355 (citing Holcomb, 433 F.3d at 897)). In Hamilton, for instance, the relevant agency manual required "documentation of a promotion action 'sufficient for a reviewer to reconstruct the action in its entirety' as well as maintenance of complete promotion files for two years[,]" yet interviewers had retained almost no records in the plaintiff's case. Id. at 1356 (quoting Internal Revenue Manual § 6.335.1.12.16 (2002)).

Kilby-Robb contends that Rees and Anderson did not create a standard set of interview questions or take notes during the interviews. But she does not explain why those practices are necessary for DOE promotion interviews. DOE's personnel manual sets forth the Department's merit promotion standards and instructs leadership on how to fill vacant positions. Pl. Opp'n Ex. A at 1261–82 (DOE Personnel Manual Instruction). The manual states generally that interviews should allow management to acquire additional information about the candidate and enable the candidate to discuss the position and her qualifications. Id. at 1275–76. Outside of that, the manual provides no guidance to selecting officials on whether to create interview questions, whether all candidates should be asked the same questions, or whether to take notes during the interviews. Id. Kilby-Robb offers no other guidelines or regulations containing more stringent requirements. See

---

provide a written report of the expert's testimony. Because Kilby-Robb failed to properly disclose the expert testimony, DOE did not have an opportunity to depose the witness or obtain its own expert to offer opposing testimony. Therefore, the Court excludes the expert testimony under FRCP 37(c)(1). See Wannall v. Honeywell International, 292 F.R.D. 26, 35–36 (D.D.C. 2013) (excluding expert not disclosed prior to summary judgment briefing); Mitchell v. Bannum, No. 06-491, 2007 WL 3054863, at *1–2 (D.D.C. Oct. 19, 2007) (same); Kasparian v. Eli Lily, No. 06-290 , 2007 WL 7700419N, at *1 (D.D.C. April 17, 2007) (same).

Hicks v. Gotbaum, 828 F. Supp. 2d 152, 163 (D.D.C. 2011) (failure to appoint representative or
investigate allegations not evidence of irregular procedures where plaintiff did not demonstrate
these activities were the agency's regular practice); cf. Hamilton, 666 F.3d at 1356 (basing its
reasoning on the specific published agency rules that had been violated in the plaintiff's case).
Kilby-Robb instead points to the testimony of Vicki Cosey, the human resource specialist who
managed the recruitment process, who opined that all candidates should be asked the same
questions during interviews.  Pl. Opp'n at 32, Ex. B at 335–36 (Cosey's Test. at EEOC Hr'g).  Even
assuming standard interview questions are preferable, Cosey's testimony does not demonstrate that
using unique questions is procedurally improper.  Nor does Cosey say that DOE typically uses
standard questions, or that the interview questioning here was in some way suspect or unorthodox.
Although Kilby-Robb asserts that Rees asked inappropriate questions, none of the questions she
cited—which include "Why did you apply for this type of job?" and "When did you lead the work
of others?"—strike the Court as inappropriate or discriminatory.  Kilby-Robb also accuses Rees of
being gruff in the interview.  That alone, however, is insufficient to raise an inference of
discrimination or pretext.

Kilby-Robb further claims that Rees invited her to a meeting without further describing its
purpose, and that she had to send an email response to find out that it would be her interview.  Pl.
Opp'n at 6, Ex. A at 1074 (Emails between Kilby-Robb and Rees).  Besides the minor
inconvenience of not knowing the meeting itinerary for a few hours, it is unclear what significance
Kilby-Robb attributes to this minor oversight.  Nor does Kilby-Robb explain what policies Rees
may have violated or how the manner in which she learned of the interview demonstrates pretext.
Id. at 1261–82.

Finally, pointing to a requirement in the personnel manual that candidates be ranked by "a
promotion panel or the personnel office staff[,]" Pl. Opp'n, Ex. A at 1262, 1274 (DOE Personnel

Manual Instruction), Kilby-Robb asserts that DOE violated its procedures by failing to rank her and

Kreppel.  Pl. Opp'n at 32.  But Kilby-Robb has failed to establish that the candidates were not

ranked in this manner.  She cites to testimony by Rees, the selecting official, who acknowledges

that she did not rank either candidate during the interview process.  Id. Ex. B at 206–207 (Rees

Test. at EEOC hearing).  Cosey testified, however, that rankings are not required at the interview

stage, and that the candidates were ranked earlier in the process.  See id. at 278–79, 309 (Cosey

Test.) (explaining DOE candidate rating procedures).  Absent some specific evidence by Kilby-

Robb as to how candidates must be ranked and how that process was violated, she has not put forth

evidence demonstrating irregular practices.   Accordingly, the Court will dismiss Kilby-Robb's

discrimination claims under Title VII and the ADEA.

### B.  Retaliation Claim

Kilby-Robb also alleges that the Department promoted Kreppel over her in retaliation for

her prior EEOC claim of race discrimination.  To make out a *prima facie* case of retaliation, a

plaintiff must show that "(1) [s]he engaged in protected activity; (2) [s]he was subjected to an

adverse employment action; and (3) there was a causal link between the protected activity and the

adverse action."  Hamilton, 666 F.3d at 1357 (quoting Woodruff v. Peters, 482 F.3d 521, 529 (D.C.

Cir. 2007)).  An EEOC complaint constitutes protected activity, and nonselection for a promotion

can constitute an adverse employment action.  See id.  The Supreme Court recently held that in

retaliation suits under Title VII, a plaintiff must show that retaliation was a "but for" cause of the

adverse employment action, meaning "that the unlawful retaliation would not have occurred in the

absence of the alleged wrongful action or actions of the employer."  Univ. of Tex. Sw. Med. Ctr. v.

Nassar, 133 S. Ct. 2517, 2533 (2013).  The same burden-shifting framework applies to retaliation

claims as to discrimination claims; once a defendant demonstrates a nondiscriminatory justification

for the adverse action, "a court reviewing summary judgment looks to whether a reasonable jury

could infer retaliation from all the evidence, which includes not only the *prima facie* case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and [plaintiff's] evidence of retaliation."  Gaujacq v. EDF, Inc., 601 F.3d 565, 577 (D.C. Cir. 2010) (quotation omitted).

Kilby-Robb filed her EEOC complaint against the Department in November 2003.  Kilby-Robb, 522 F. Supp. 2d at 153.  She alleges that in a December 2004 meeting Rees asked her if she "wanted money [or] wanted to be happy," and that John Fiegel, her immediate supervisor, called her an embarrassment and repeated several times that she had made a mockery out of civil rights by filing her EEOC complaint.  Pl. Opp'n Ex. A at 1005–06.  Rees and Fiegel allegedly added that Kilby-Robb "had no right to file" her EEOC complaint.  Id.

Temporal proximity between an adverse employment action and protected activity may alone raise an inference of discrimination sufficient to overcome summary judgment.  Hamilton, 666 F.3d at 1357.  Here, however, Kilby-Robb filed her November 2003 EEOC complaint twenty months before the August 2005 hiring decision, which is too attenuated to support an inference of retaliation.  See id. at 1357–58 (delay of more than three months is generally too long to support inference of retaliation).  But a plaintiff claiming retaliation may also provide direct evidence— meaning "expressions by the decision maker that are evidence of discriminatory or retaliatory intent[,]" Hampton v. Vilsack, 760 F. Supp. 2d 38, 49 (2011)—in lieu of temporal proximity. Dudley v. Washington Metro. Area Transit Auth., 924 F. Supp. 2d 141, 180 (D.D.C. 2013) (citing Winston v. Clough, 712 F. Supp. 2d 1, 11 (D.D.C. 2010).  Kilby-Robb's account of the statements of Rees and others at the December 2004 meeting, which the Court must accept as true for the purpose of this summary judgment motion, is direct evidence tending to show that Rees harbored a retaliatory animus towards Kilby-Robb.  Although Rees' statements are not specifically tied to the selection decision at issue here, they are sufficient for a reasonable jury to infer that Rees' opinion

of Kilby-Robb's EEO complaint influenced her later hiring decision.  Kilby-Robb's retaliation

claim thus turns on questions of intent and witness credibility, which are not appropriately resolved

on summary judgment.

To establish causation under the Supreme Court's recent line of cases, Kilby-Robb must

demonstrate that retaliation was the "but for" cause of the adverse employment action, a more

restrictive standard than for claims of discrimination.  See Nassar, 133 S. Ct. at 2533.  While Kilby-

Robb has not presented sufficient evidence for a reasonable jury to conclude that she was

substantially more qualified than Kreppel, the relative difference in their qualifications does not so

greatly favor Kreppel that no reasonable jury could conclude Kilby-Robb would have been

promoted but for the alleged retaliatory animus of Rees.  A fellow court in this district reasoned

similarly in Youssef v. Holder, No. 11-1362, 2014 WL 3796393 (D.D.C. Aug. 1, 2014).  There, the

court granted summary judgment to the employer on the plaintiff's claim of national origin

discrimination because the plaintiff failed to demonstrate that he was significantly more qualified

than the selectee, but it permitted the plaintiff's retaliation claim to go forward.  Id. at *2.  The

defendant moved for reconsideration, arguing that Nassar compelled the opposite result, but the

court reasoned that the *plaintiff's* failure to prove superior qualifications was not necessarily

inconsistent with a jury finding that retaliation was the but for cause of his nonselection.  Id.  While

this is a close case, the Court concludes for similar reasons that Kilby-Robb has put forth sufficient

evidence to support an inference of retaliation and thus survive summary judgment on this claim.

**IV.      Conclusion**

For the reasons stated above, the Court will grant Defendants' motion for summary judgment with respect to Kilby-Robb's claims of discrimination under Title VII and the ADEA and deny its motion with respect to Kilby-Robb's claims of retaliation.  The Court will issue an order consistent with this memorandum opinion.

 

 

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: ___January 8, 2015_____